**MASON v. UNITED STATES.**
**No. 9979.**

Circuit Court of Appeals, Eighth Circuit.

Dec. 31, 1934.

Rehearing Denied Feb. 6, 1935.

Oscar J. Mudd, of St. Louis, Mo. (Stanley Wallach and Foristel, Mudd, Blair & Habenicht, all of St. Louis, Mo., on the brief), for appellant.

J. Gregory Bruce, Atty., Department of Justice, of Washington, D. C. (Harry C. Blanton, U. S. Atty., of Sikeston, Mo., Will G. Beardslee, Director, Bureau of War Risk Litigation, of Washington, D. C., Wilbur C. Pickett, Sp. Asst. to Atty. Gen., and Irwin Sale, Asst. U. S. Atty., of St. Louis, Mo., on the brief), for the United States.

Before STONE, GARDNER, and VAN VALKENBURGH, Circuit Judges.

STONE, Circuit Judge.

This is a war risk insurance case. Jury was waived, and judgment was entered for the United States on the finding by the court that the plaintiff was totally and permanently disabled at the time he applied for and was issued the insurance contract.

Appellant was inducted into the service August 31, 1918; was granted an insurance contract September 7, 1918; honorably discharged November 26, 1918. The insurance contract lapsed on March 3, 1919. The petition alleges permanent and total disability because of blindness on February 24, 1919.

At the time of oral argument, counsel for plaintiff waived the contention in his brief that appellant must be conclusively held to have been fit for military service at the time of his acceptance and enrollment into the army. The appeal was presented on the sole question of whether there was substantial evidence that plaintiff was so blind when the policy was issued that he was then totally and permanently disabled. If he was so disabled at that time, he cannot recover. United States v. Stevens, 64 F.

(2d) 853, 855 (C. C. A. 8); Schmidt v. United States, 63 F.(2d) 390, 393 (C. C. A. 8).

The entire evidence as to the physical condition of appellant appears in the testimony of appellant, the testimony of three doctors who examined appellant after the date he alleges for the total and permanent disability, and photostatic copies of his physical examination by the local board, the district board, and upon discharge from the service. That evidence is as follows:

The disability claimed is blindness. The medical testimony is all to the effect that the eye condition was caused by syphilis contracted some ten years before enlistment. Since the medical testimony is that the harm to the eyes from such a cause is progressive, it is important to trace the changes in eye condition in order to determine when the disability from blindness became total and permanent. This testimony begins with the winter of 1917-18. Appellant testified that during that winter and until the decorating business opened in the spring of 1918 he was steadily employed as a teamster for a lumber company—earning $15 per week. February 28, 1918, he was examined by the local draft board. The report of that examination shows, "right eye, 20/100[1]; left eye, blind," with a recommendation of fitness for "special or limited service as teamster." From the time the decorating business opened that spring until he was inducted into the service on August 31, 1918, he was a contracting painter and paper hanger earning from $45 to $50 per week. On September 7, 1918, he was examined at the mobilization camp (Camp Dodge, Iowa). The report of that examination shows "right eye 20/100-20/70; left eye 20/LP-20/200" with a recommendation of fitness for "general military service." At that time, he testifies he was having no trouble, could read bulletins, newspapers, and letters, wrote letters home and performed all of his military duties, including drilling. He noticed a change in sight when he began to take the typhoid inoculations about two weeks later. His sight remained good until the last inoculation, about September 22d. Up to that time he could read and write letters to family and read newspapers and camp bulletins. Read letters up to October 1st; after that time writing was just "black marks" and could not make out the words. Read newspapers for first two months in army. After last inoculation, eyes "blurred up" and could not read newspapers; print would "run together." During October could see "pretty well" on guard and drill duty; could see person in front of him if not too far away, but could not recognize person over twenty feet away. During service and until discharge (on November 28, 1918) was assigned to and performed general duties (he was in "Depot Company") consisting of drilling, all kinds of work, and "plenty of fatigue work." During last three weeks of service "was shovelling coal, sand, rock, splitting wood and drilling." At discharge, was "almost blind; could not see to tell who anybody was twenty feet away from me." Just before discharge (November 22d or 23d), he took the discharge examination. This report (on "Limited Service Group" form) shows "right eye 20/100 Left eye, Light Perception. Existed prior to enlistment. 'Group C.' The wound, injury, or disease is not likely to result in death or disability. In my opinion the wound, injury, or disease did not originate in the line of duty in the military service of the United States. In view of occupation he is 5 per cent disabled." He was accompanied home by a friend and assisted from the train and to his home by his wife.

After his return, the veteran boards procured several jobs for him, each of which he lost because of condition of sight. These were as follows: January 10-20, 1919, as labor roustabout at corrugated box factory; February 10-24, laborer at cold storage plant where he worked trucking boxes and barrels of meat, etc. (he could not see where to go, but followed a fellow worker on the front end of the truck); a month, beginning May 16, 1919, as janitor in an office building; October, 1920, to November, 1921, was taking vocational training for blind; then placed with tire company for seven or eight months to learn tire vulcanizing; April to November, 1923, tried to conduct little tire vulcanizing shop of his own; then tried to learn labeling of cans at baking powder factory; then taught broom making, after which opened broom shop; thereafter at Soldiers' Home until May 1, 1933, when re-

---

[1] Conditions of vision are determined by various established tests. Just short of blindness is the ability to distinguish light. The next degree is ability to see movement of hands or objects close to the eyes. Beyond this, the test is the distance required to distinguish letters of various sizes measured by millimeters. The normal sight is 20 millimeter letters at 20 feet, and is designated by the symbol 20/20. A 10/200 vision means ability to distinguish a letter 200 millimeters high at a distance of 10 feet.

56

leased; since then living with a brother—no occupation and no earnings.

The remainder of the testimony is that of three medical examiners for the Veterans' Bureau who examined appellant subsequent to his discharge. Dr. Van Meter examined him March 15, 1919, and found 90 per cent. disability, and regarded him as unable continuously to perform any part of his former or any other occupation. He stated the cause of blindness was syphilis. He could not say how long the condition he found had existed, but that it was permanent.

Dr. Dyer examined him September 25, 1919, January 31, 1920, and October 25, 1933. At September examination, found left eye with only light perception and right eye 10/200 with field of vision (laterally) much contracted. At ten feet he could read letters about five inches high. Although he could get about in a well-lighted room familiar to him, he was, for "economical" purposes, blind. The cause was progressive atrophy of eye nerves. At the January examination, he noted no change except "slight progression." At the October examination, he was blind having only light perception. From time of first examination, appellant was unable to carry on a substantially gainful occupation. While light perception in one eye and 10/200 vision in other are on border line of ability to do things, yet when to that condition is added contraction of field of vision, as here, appellant becomes "a menace to himself and to other people." Syphilis varies in the rate of progress of its effects; sometimes it is rapid and sometimes slow. He testified:

"If this man was unable to read the print in a newspaper as early as November 26, 1918, except to visualize the black parts of the paper, unable to read the handwriting in correspondence that he received, except to be able to note black markings on the paper, unable to read bulletins which were on the bulletin board, and guard notices posted in the army at that time, and if he began work on January 10, 1919 and worked for about ten days, during which time he could distinguish objects but was unable to continue his work because of his blindness, or failing eyesight, and if in February following he worked two weeks as a laborer being compelled to follow another man around because he couldn't see more than twenty feet ahead of him, it would be my opinion that over this period from November 26, 1918 to February 24, 1919 he had the condition which I found.

At previous times, in my opinion, taking into consideration my experience and findings in the case, he had not had the condition to a degree that would disable him from continuously carrying on a substantially gainful occupation. Taking into consideration the history from November 26, 1918 to February 24, 1919, and adding to that history my findings and examination of September 25, 1919, in my opinion I hardly thought this man would be able to continuously carry on a substantially gainful occupation over that period from November 26, 1918 to February 24, 1919. * * *

"Q. Doctor, assuming that this man—assuming that a man had a vision of light perception in one eye and 10/200 in the other eye on September 25, 1919, and that in February of 1918 he had a vision of light perception in one eye and a vision of 20/100 in the other eye, what do you say as to whether or not that person could carry on continuously a substantially gainful occupation between February 1918 and September 25, 1919? * * *

"Considering the two types of vision, and the intervening period, it will be possible, if, as he says, the fields had not contracted and other conditions were normal, so that he had that vision in there accompanied by the other conditions they expect. For instance I have a number of farms[?] that do that kind of work and they haven't any more vision than that. They have very limited fields where it is possible for a man in the condition that Mr. Mason is in now to carry on continuously certain types of occupation; broom making, and so forth, that the Commission for the Blind are able to help them with. There are, of course, certain men who are in the same condition, or in a condition equally as bad, or worse than the condition Mr. Mason is, who are carrying on continuously substantially gainful occupations in particularly specialized fields, but they are very limited in regard to their earnings.

"A man with light perception in one eye and 20/100 in the other eye, as of February 1918, could, under some circumstances, carry on continuously a substantially gainful occupation. A man who had light perception of the left eye and 10/200 of the right eye, as of September 25, 1919, could not carry on a substantially gainful occupation. Assuming that was the same man, then somewhere in between there his condition changed. It is my opinion that Mason was unable to carry on a substantially gainful occupation be-

tween November 26, 1918 and the time I examined him in September, 1919. I did not examine him before November 26, 1918, did not know what kind of work he was doing, but if he was able to read and write and read bulletins and matters of that kind while he was in the army, having the history before me, I would say that Mason was at that time able to carry on a substantially gainful occupation."

Dr. Parry examined appellant March 1, 1924, and in July, 1925. At the March examination his diagnosis was "blindness bi-lateral and total optic atrophy, bi-lateral, permanently and totally disabled under Regulation 47." As to the July examination he testified:

"I stated that at that time it is quite possible that the condition could have been aggravated, and probably was, by typhoid inoculations. I was familiar with the three different [innoculations] called the triple typhoid [innoculation].

"There are [numberous] things that can act as a provocative when there is a blood [dysocrascia], and my opinion in giving the additional notation was the fact to possibly bring before the rating board the fact that it could have been aggravated by the [innoculations]. Anything where there is a blood [dysocrasia] can act as a provocative and stimulate existing conditions, or even renew the condition.

"If before the typhoid [innoculations] were administered the man was able to read a newspaper and read and write letters, go about without difficulty, and carry on the ordinary duties of a soldier in the army, and if after the [innoculations] were completed he suffered a blurring of the vision of his eyes, and thereafter within a month or so began to lose the sight of his eyes to the extent he could not read newspaper print and could not thereafter read or write letters, my opinion with respect to the effect of the typhoid [innoculations] upon the man's condition was that it could be provocative. It is a possibility that it could have aggravated or provoked the condition to a point where it would cause total blindness subsequently."

It was impossible to tell from the conditions he found whether that condition was present as early as January or February, 1919.

"The ordinary progress of that condition is frequently stationary for a long period of time; a person may have a certain amount of vision and carry that on for a number of years. Then possibly it could be suddenly provoked or aggravated by some other condition, or some other occurrence in the human body. For instance, such as the triple typhoid [innoculation] in September 1918, could have aggravated and speeded it up."

The issue here is whether the above evidence contains substantial evidence that the blindness of appellant was of a degree to render him permanently and totally disabled as of September 7, 1918, when this insurance became effective. We think it does not. The undisputed evidence is that appellant actually worked as a teamster during the winter of 1917-18 and into the spring of 1918, when he became an independent contractor for wall papering and painting and that he worked at that business until his induction into the service, on August 31, 1918, earning from $45 to $50 per week; that in his physical examination of September 7, 1918, he was classified as fit for general military service; that he performed such service for several months thereafter; that the causation disease is progressive in results; that such progress may be accelerated by inoculations such as he took during that September. There is no evidence to the contrary. We can find no basis for holding that there is substantial evidence therein that appellant was totally and permanently disabled on September 7, 1918.

Since the trial court found the disability existed when the insurance contract began, naturally there was no finding otherwise as to whether such disability had arisen during the life of the contract. Therefore, this being an action at law, we have no jurisdiction to determine on this appeal whether, from the conflicting evidence here, a permanent and total disability arose during the life of the contract.

The judgment is reversed, and the case remanded for a new trial.